UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESEE
NASHVILLE DIVISION

ANTHONY UNDERWOOD,

     Plaintiff,

v.

YATES SERVICES, LLC,

     Defendant.

Case No. 16-cv-03276
Honorable Laurie J. Michelson
Magistrate Judge Barbara D. Holmes

## OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [26]

Anthony Underwood alleges that he was terminated from his job as a forklift operator at Yates Services, LLC, because of his disability and because he requested disability leave, in violation of the Family Medical Leave Act ("FMLA") and the Americans with Disabilities Act ("ADA"). Yates asserts that it fired Underwood for performance and attendance issues. Presently before the Court is Yates' motion for summary judgment. (R. 26.)

Because the briefing from the parties is complete (R. 26–28; R. 30–31; R. 33; R. 41), and because neither party has requested a hearing, the Court forgoes oral argument. *See* M.D. Tenn. LR 78.01. The Court finds that Underwood has failed to raise any genuine issue of material fact as to whether his termination was in violation of either FMLA or ADA and that his claims fail as a matter of law. Therefore, the Court will grant Yates' motion for summary judgment.

### I.

The Court has read the record in the light most favorable to Underwood; but, to fully understand each party's position, the Court will highlight the few areas where the accounts differ.

**A.**

First, some general background. Yates sends employees to work in Nissan's Smyrna, Tennessee plant. (R. 28, PageID.659; R. 31, PageID.700.) On August 4, 2012, Yates hired Underwood as a material handler and forklift operator on the body shop and car line for the Smyrna plant. (R. 28, PageID.659, 661; R. 31, PageID.700, 702.) Prior to and throughout his employment with Yates, Underwood claimed that he suffered from back spasms and pain and that these issues caused him to be disabled. (R. 28, PageID.670; R. 30, PageID.676; R. 31, PageID.714.)

Upon his hiring, Underwood signed Yates' "Smoke Free Work Place Statement of Understanding," which says, among other things, that "tobacco and snuff chewing and spitting is [sic] not allowed in Nissan buildings." (R. 28, PageID.660; R. 31, PageID.701.) And Yates' Hourly Employee Handbook states, "A tobacco-free policy restricts the use of any tobacco product in the plant at all times. The policy includes but is not limited to all smoking products, spit, tobacco, snuff, snuff pouches, and other 'smokeless' products including electronic cigarettes." (*Id.*)

When employees violated Yates' policies, Yates employed a corrective-action policy with several stages of discipline. The stages include: "(1) Coaching/Counseling; (2) Verbal Reminder; (3) Written Reminder; (4) Final Written Reminder; and (5) Termination." (R. 28, PageID.660; R. 31, PageID.701–02.) Once an employee reaches the Final Written Reminder stage of this policy, the employee is subject to termination "if written corrective action is appropriate for additional corrective action, even if the corrective action is for an unrelated issue." (R. 28, PageID.661; R. 31, PageID.702.)

The parties agree that Underwood was no stranger to the corrective-action policy. Prior to the event giving rise to his termination, Underwood's conduct from August through October 2014 resulted in several instances of corrective action. (R. 28, PageID.661–63; R. 31, PageID.702–04.)

First, on or about August 18, 2014, Underwood received counseling from Nissan area manager, Tim Johnson, for having tobacco dip in his mouth on the plant floor. (R. 28, PageID.661; R. 31, PageID.702.) Johnson reminded Underwood of the tobacco policy and informed him that he would receive "some degree of corrective action" for violating this policy. (R. 28, PageID.661; R. 31, PageID.703.) About ten days later, Keith Brown, then the Nissan area supervisor, verbally counseled Underwood for damaging a rack of fenders in a forklift incident on August 1, 2014. (R. 28, PageID.662; R. 31, PageID.703.) Next, Underwood failed to appear at work on October 12, 2014, and thus received attendance counseling the next day (or so). (R. 28, PageID.662; R. 31, PageID.703.) Similarly, Underwood received a verbal reminder two days later for arriving late to work, and failing to inform his supervisor of the tardiness. (*Id.*)

Despite the corrective actions, Underwood's work performance worsened. About a week later, Underwood damaged three rear doors by backing his forklift into the rack on which they were housed. (R. 28, PageID.662; R. 31, PageID.704.) Mike Tisdell, Nissan's new area supervisor, referenced the forklift incident in an October 27, 2014 memorandum. (R. 28, PageID.662; R. 31, PageID.704.) Tisdell called Underwood's failure to look in the direction he was traveling a "major safety violation." (R. 28, PageID.662; R. 31, PageID.704.) Tisdell further claimed this was Underwood's "second serious safety infraction where workers were present in less than three months." (R. 28, PageID.662-63; R. 31, PageID.704.)

Due to the two forklift accidents and the two attendance policy infractions, in late October 2014, Underwood was given a Final Written Reminder for "job performance (safety) and attendance." (R. 28, PageID.663; R. 31, PageID.704.) The Final Written Reminder memo stated, in part:

> This final written reminder is the third step of the four-step corrective action process. This step is sometimes called the decision-making stage. You are

encouraged to continue working with the understanding that you must correct these problems. Failure to correct your poor performance and attendance issues may result in further corrective action, up to and including termination.

(R. 28, PageID.663; R. 31, PageID.705.) Additionally, the memo stated that "the company may also terminate your employment if you violate any other company rule, practice, or policy that would cause you to receive formal [corrective] action (Written Reminder or more severe corrective action) while this written reminder remains in effect." (R. 28, PageID.663; R. 31, PageID.705.)

Underwood sees things differently. Underwood claims that around the time of receiving the October 2014 Final Written Reminder, Johnson told Underwood "it was either [his] medication or his job . . ." and that Underwood informed an unspecified Human Resources employee of the comment around October 27, 2014. (R. 28, PageID.669–70; R. 31, PageID.713–14.)

On November 26, 2014, Underwood's performance issues came to a head. Most importantly, Underwood "fell behind on getting parts to the assembly line," causing part shortages and down time. (R. 28, PageID.664; R. 31, PageID.705.) The delay was such that other employees complained about it to Johnson, and also mentioned that Underwood would step off his forklift. (R. 28, PageID.664; R. 31, PageID.706.)

Underwood testified that his issue getting parts to the assembly line was due to back spasms and he had left his forklift to stretch. (R. 28, PageID.664; R. 31, PageID.706.)

Yates says Underwood was sent home that day due to "continued job performance/safety issues and was suspended." (R. 28, PageID.664.)

Underwood agrees that the events on November 26, 2014 are Yates' documented reason for his suspension, but he disputes that they were the exclusive reason. (R. 31, PageID.706.) He adds that Johnson "'got real up in [his] face, talked to him in a very threatening way' and told Underwood that he 'would fire the hell out of him' if he got off the forklift again." (*Id.*) Johnson

had Underwood submit to a sobriety test (*Id.*), and again told Underwood that "he would have to choose between taking his medication and his job." (R. 28, PageID.669; R. 31, PageID.706–07, 713.)

Underwood was contacted on December 9, 2014 and was asked to return to work (R. 28, PageID.664; R. 31, PageID.707) after management discovered procedural errors in the handling of Underwood's suspension (R. 30, PageID.682). Underwood returned to work a few days later. (R. 28, PageID.664; R. 31, PageID.707.) Upon Underwood's return, he received an additional memorandum extending his Final Written Reminder for one year (from December 11, 2014). (R. 28, PageID.665; R. 31, PageID.707.) This memo reminded Underwood that "the company may also terminate your employment if you violate any other company rule, practice, or policy that would cause you to receive formal corrective action (Written reminder or more severe corrective action) while this final written reminder remains in effect." (R. 28, PageID.665; R. 31, PageID.707–08.) Underwood understood that, while this policy was in effect, he could be terminated for any further violations. (R. 28, PageID.665; R. 31, PageID.708.)

Underwood did not last long. On December 12, 2014, Underwood used chewing tobacco in a policy-designated area while on break. But he brought his spit cup inside the plant with him after break, set it on his forklift, and forgot to throw it away after he got busy with work. (R. 28, PageID.665–66; R. 31, PageID.708–09.) Yates asserts that on this same day, Tisdell, who was on shift, observed the cup, spit, and tobacco on Underwood's forklift. (R. 28, PageID.666.) Underwood insists that the cup had additional trash covering it, and thus denies that Tisdell could observe the tobacco and spit as he walked up. (R. 31, PageID.709.) But Underwood concedes that during his conversation with Tisdell, he admitted "it was his tobacco in the cup." (R. 28, PageID.666; R. 31, PageID.709.) Yates claims that, as a result of this incident, Underwood's prior

counseling for tobacco usage (August 18, 2014), and Underwood's Final Written Reminder status, Tisdell recommended his termination. (R. 28, PageID.666.)

Following the incident on December 12, 2014, Yates Employee Relations Representative, Kassidy Strickland, interviewed Underwood. (R. 28, PageID.667; R. 31, PageID.710.) Strickland reminded Underwood of the tobacco policy, and advised him that "having dip inside these walls is in violation of the tobacco policy." (R. 28, PageID.667; R. 31, PageID.710.) Given Underwood's prior verbal counseling for violation of the tobacco policy, Strickland also communicated that the current incident and ensuing verbal reminder warranted a "written reminder for tobacco." (R. 28, PageID.667; R. 31, PageID.710.) Finally, Strickland informed Underwood that he was at risk of termination since "according to policy, if you get a written reminder while you are on a final written there are grounds for termination." (R. 28, PageID.667; R. 31, PageID.710.) Following the interview, Underwood was sent home, pending Yates' investigation into the incident. (R. 28, PageID.667; R. 31, PageID.711.)

Underwood claims to have mentioned Johnson's two your-medicine-or-your-job comments to Strickland during, or around the time of, this investigation period. (R. 28, PageID.669; R. 31, PageID.713–14.)

On December 12, 2014, Johnson sent a memo recommending Underwood's termination given Underwood's Final Written Reminder standing, previous tobacco verbal reminder, and most recent written reminder for tobacco policy violation. (R. 28, PageID.668.) The memo stated that "Nissan/Yates ER and Management agree with this recommendation." (R. 28, PageID.668.) Following the investigation, Underwood was advised of his termination. (R. 28, PageID.669; R. 31, PageID.713.)

Yates asserts that Greg Persinger, Manager of Human Resources at Yates, made the ultimate decision to terminate Underwood. (R. 28, PageID.668.) Underwood concedes that Persinger had no knowledge of Underwood's health issues or FMLA activity. (R. 28, PageID.669; R. 31, PageID.713.) But he contends that several of his managers and supervisors, including Johnson and Tisdell, and human resources employees jointly made the decision to terminate Underwood, and that the termination decision was already made by the time it reached Persinger for approval. (R. 31, PageID.711–12.)

**B.**

Throughout the course of his employment with Yates, Underwood visited Comprehensive Neurology Center on four occasions regarding his back issues. (R. 28, PageID.670; R. 31, PageID.714.) The work excuses provided at these appointments did not impose any restrictions on Underwood's ability to work, nor did the excuses recommend Underwood receive additional breaks. (R. 28, PageID.670; R. 31, PageID.714.) Underwood did not recall a physician issuing any permanent work restrictions due to his back issues. (R. 28, PageID.670; R. 31, PageID.715.) Nor was he aware of any doctor's statements that Underwood required leave during the period of October to November 2014. (R. 28, PageID.673; R. 31, PageID.718.)

In November 2013, Underwood submitted an application and certification form from his healthcare provider for leave under the FMLA. (R. 28, PageID.671; R. 31, PageID.716.) His request was approved in February 2014, and allowed Underwood to take a "two to three day" leave once every two to three months for his back issues. (R. 28, PageID.671; R. 31, PageID.716.) Underwood admits that, during his employment with Yates, he was allowed FMLA leave when needed. (R. 28, PageID.671–72; R. 31, PageID.716–17.)

In October 2014, Underwood again applied for FMLA leave with a certification form from his doctor, Dr. Schneider. (R. 28, PageID.672; R. 31, PageID.717.) On this certification, Dr. Schneider "wrote 'unknown' next to the question of 'will the patient be incapacitated for a single continuous period of time, including any time for treatment and recovery?'" (R. 28, PageID.672; R. 31, PageID.717.) Additionally, Dr. Schneider did not think that Underwood would "require care on an intermittent or reduced schedule basis, including any time for recovery" and did not provide an estimate of "the hours the patient needs care on an intermittent basis, if any." (R. 28, PageID.672; R. 31, PageID.718.) In November 2014, this second request was denied as the certification did not request leave. (R. 28, PageID.673; R. 31, PageID.718.)

## C.

Underwood filed the present complaint alleging four separate claims (two counts) under the FMLA and ADA: (1) FMLA interference; (2) FMLA retaliation; (3) ADA discrimination; and (4) ADA retaliation. (R. 1, PageID.4-6.) After the parties conducted discovery, Yates moved for summary judgment on all counts. (R. 26.)[1]

## II.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the

---

[1] Yates contends that summary judgment should be granted solely on the grounds that, according to local Tennessee rules, Underwood's response to Yates' motion: (1) was filed two days past the deadline, and (2) exceeded the page limit by three pages. (R. 33, PageID.722.) The Court will exercise its discretion to consider the extended, late-filed response and rule on substantive grounds.

light most favorable to Underwood. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

### III.

The FMLA allows employees with a qualifying medical condition to take up to 12 weeks of leave during a 12-month period. *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 420–21 (6th Cir. 2004); 29 U.S.C. § 2611(2); 29 U.S.C. § 2612(a)(1)(D). The Sixth Circuit "recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Festerman v. Cty. of Wayne*, 611 F. App'x 310, 314 (6th Cir. 2015) (quoting *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)).

Under the ADA, employers cannot discriminate against individuals with qualifying disabilities by failing to provide reasonable accommodations, 42 U.S.C. § 12112(5)(A), or by using an employee's disability as a basis for "discharg[ing]" them. 42 U.S.C. § 12112(a).

For each FMLA and ADA claim, if the record lacks any direct evidence of discrimination or retaliation, the Sixth Circuit applies the *McDonnell Douglas* burden-shifting framework. *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891–92 (6th Cir. 2016) (applying this framework in the ADA discrimination context); *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (applying this framework in the FMLA retaliation context); *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (applying this framework in the ADA retaliation context); *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (applying this framework in the FMLA interference context). The Court finds that the record lacks any direct evidence of discrimination and thus will apply *McDonnell Douglas*.

Under this three-part framework: (1) Underwood first must prove a *prima facie* case for each of his claims, (2) Yates can then rebut the prima facie showing with a "legitimate, non-discriminatory reason" for the termination, and finally, (3) Underwood can invalidate Yates' proffered reason with evidence of pretext. *Barlia v. MWI Veterinary Supply, Inc*., 721 F. App'x 493, 444–45 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)) (other citations omitted). Each of Underwood's four claims is analyzed using this approach in the following sections.

**A.**

First, Underwood "bears the initial burden of establishing a prima facie case" for each of his four claims. *Barlia*, 721 F. App'x at 444 (citing *McDonnell Douglas*, 411 U.S. at 802). The Court will discuss each *prima facie* case separately. As the alleged discriminatory and/or retaliatory action—Underwood's termination—is the same in most of these claims, the Court will discuss steps two and three of the *McDonnell Douglas* framework collectively in Parts III.B and III.C below.

**1.**

To establish a valid claim for FMLA interference, Underwood must show that: (1) he is an eligible employee, (2) Yates is an "employer" under the FMLA, (3) he was entitled to leave, (4) he gave Yates notice of his intention to take leave, and (5) Yates denied the leave. *See Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016) (citation omitted).

Yates argues that only the October 2014 request can serve as the basis for Underwood's FMLA interference claim as the November 2013 request was granted, and, viewing that 2014 request only, Underwood has failed to show entitlement to the benefits. (R. 27, PageID.77–79.)

As a threshold matter, Underwood appears to have failed to respond to Yates' arguments regarding his FMLA interference claim. (See R. 30.) The Sixth Circuit's "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citations omitted). Even if the claim was not abandoned, summary judgment is still warranted.

The parties agree that Underwood's November 2013 FMLA application was granted, and that he was allowed some leave by Yates under this request. (R. 28, PageID.671–72; R. 31, PageID.716–17.) And there is no evidence in the record to suggest that Underwood ever requested and was subsequently denied days off of work once his 2013 FMLA request was granted. Thus, failing the fifth element of a prima facie interference case, the November 2013 FMLA request cannot serve as a basis for an FMLA interference claim. *See Tennial*, 840 F.3d at 308.

And it is undisputed that Underwood's October 2014 FMLA request was denied because Underwood's doctor (Dr. Schneider) did not request any leave on the certification form. (R. 28, PageID.672-73; R. 31, PageID.717-18.) Underwood argues that the denial of this request raises a genuine issue of material fact as to why Dr. Schneider marked "no" for additional leave. But Yates was "entitled to rely on [this] 'negative certification' in denying [Underwood's] FMLA leave" without making any further inquiry. *Nawrocki v. United Methodist Ret. Communities, Inc.*, 174 F. App'x 334, 338 (6th Cir. 2006) (citing *Stoops v. One Call Commc'ns, Inc.*, 141 F.3d 309 (7th Cir. 1998)). Consequently, the 2014 FMLA request fails prong three, so Underwood cannot establish a prima facie case of FMLA interference. *See Tennial*, 840 F.3d at 308. Summary judgment is warranted on this claim.

**2.**

Yates also moves for summary judgment on Underwood's FMLA-retaliation claim. The prima facie test for FMLA retaliation requires Underwood to show that: (1) his activity was protected by FMLA, (2) Yates knew he was exercising these rights, (3) Yates took adverse action against him, and (4) there is a causal link between the protected activity and the adverse action. *See Donald*, 667 F.3d at 761 (citation omitted).

Yates contends that Underwood has failed to establish both that the decisionmaker knew of Underwood's protected activity, and that there is a causal connection. (R. 27, PageID.79–81.)

First, the Court must determine whether Underwood engaged in any activity protected by FMLA. Yates does not dispute that the November 2013 request for leave was FMLA-protected. (R. 27, PageID.79.) But Yates argues that because Underwood was not entitled to leave for the October 2014 request, the Court may only consider Underwood's November 2013 request and resulting FMLA activity for the first element of his prima facie case. Underwood appears to concede that the Sixth Circuit "instructs courts to examine whether a plaintiff was *entitled* to FMLA leave to determine whether he engaged in 'statutorily protected activity.'" (R. 30, PageID.696 (citing *Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 338 (6th Cir. 2009)) (emphasis added); *see also Nawrocki*, 174 F. App'x at 339. Thus, the Court will only consider the November 2013 request.

Second, the parties dispute who at Yates made the final decision to terminate Underwood and therefore, who should be considered in analyzing the "knowledge" prong of the test. Yates argues that Persinger, an HR manager with final sign-off on all terminations, should be viewed by the Court as the final decisionmaker (R. 28, PageID.668.) And Persinger stated in his deposition that he did not know whether Underwood took FMLA leave. (R. 27-2, PageID.356.) In

Underwood's view, however, the termination decision was made by a group of managers, supervisors, and HR employees, at least some of whom knew of Underwood's FMLA activity. (R. 30, PageID.695; R. 31, PageID.711–12.) Assuming Underwood's view, he has satisfied prong two.

From the briefing, Yates does not appear to assert the failure of prong three, adverse action. (*See* R. 27, PageID.79–81.) Moreover, in its ADA discrimination analysis, Yates explicitly concedes that it took an adverse employment action against Underwood. (R. 27, PageID.85–86.) So from here on out, the Court will assume Underwood's termination satisfies the adverse-action element of all prima facie tests.

And finally, Yates asserts that Underwood failed to show a causal connection between the FMLA activity and the termination, as temporal proximity is not alone sufficient to establish causation. (R. 27, PageID.80–81.) But the Sixth Circuit "has held that the timing of an employee's firing in relation to the exercise of [his] FMLA rights may suffice to establish a causal connection for purposes of making out a prima facie case of retaliation." *Cooley*, 720 F. App'x at 742 (citation omitted); *see Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir.2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of establishing a prima facie case of retaliation."). Underwood's November 2013 FMLA application (the protected activity) was approved in February 2014, (R. 28, PageID.671; R. 31, PageID.716), and expired in July 2014. (R. 30, PageID.677.) The Sixth Circuit measures the relevant timeframe from when the "employer learns of a protected activity" to the date of the adverse action, *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 452 (6th Cir. 2017) (citation omitted). Underwood alleges that near the time the November 2013 FMLA request was set to expire, July 2014, he came under new supervision by

Tisdell and Johnson. (R. 30, PageID.677.) Thus, construing this liberally in favor of Underwood for purposes of this motion, and using July 2014 as the date upon which the "employer learn[ed] of a protected activity," there were approximately four months between his managers learning of Underwood's protected activity and his termination. In similar cases, a two-to-three-month time lapse between the expiration of leave and termination of employee has been sufficient to show a causal connection. *See e.g., Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 409 (6th Cir. 2014) (citation omitted). However, in other similar cases still, the Sixth Circuit found that a two-and-a-half-month lapse is not alone sufficient to prove causality, as this timing was refuted by other evidence. *See Bush*, 683 F. App'x at 452-53. The Sixth Circuit recently opined that any period less than ten weeks is sufficient, but anything longer requires other evidence of causation. *Stein v. Atlas Indus.*, 730 F. App'x 313, 319 (6th Cir. 2018). As the record here contains no other evidence of causation, Yates would be entitled to summary judgment on this failure of the prima facie case. But out of an abundance of caution, and because the analysis applies to other claims, the Court will consider the other elements of the *McDonnell Douglas* test below.

**3.**

To prove a prima facie case of discrimination under the ADA, Underwood must show that: (1) he is disabled, (2) with or without accommodation, he is otherwise qualified for the position he held, (3) Yates made some adverse employment decision against him, (4) Yates knew or had reason to know of his disability, and (5) the position remained open or he was replaced. *See Whitfield v. Tennessee*, 639 F.3d 253, 258–59 (6th Cir. 2011) (citations omitted).

For the purposes of its summary-judgment motion only, Yates has explicitly conceded elements one, two, three, and five. (R. 27, PageID.86.) The remaining element, four, hinges on who made the ultimate termination decision, and, as discussed, the parties dispute this fact. The

Court will again take the record in the light most favorable to Underwood and assume that, for the purposes of this proceeding, the ultimate decision maker was aware of Underwood's disability. Thus, the Court will proceed with its analysis under the assumption that Underwood has established a prima facie case of ADA discrimination.

**4.**

Woven throughout his response, Underwood argues that Yates failed to accommodate his disability in contravention of the ADA. (*See, e.g.,* R. 30, PageID.685–86.) In particular, Underwood asserts that he should have been granted FMLA leave and allowed to get off his equipment to stretch his back. (R. 41, PageID.750.) Yates argues in its reply that Underwood did not assert an ADA failure to accommodate claim in his complaint. (R. 33, PageID.725-26.) But Underwood arguably *did* raise a reasonable-accommodation claim in his complaint. (R. 1, PageID.5–6.) And since Yates only addressed this argument in its reply, the Court provided Underwood the opportunity to file a sur-reply. He took this opportunity. (R. 41.) So the Court will address this claim.

No reasonable jury could find that Underwood was denied a reasonable accommodation.

The record does not support an inference that Underwood made a specific request for an accommodation, such as time off or time to stretch his back. "[Sixth Circuit] case law establishes no bright-line test for when the form of an employee's request is sufficiently clear to constitute a request for an accommodation." *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 407 (6th Cir. 2014). While Underwood was not required to use the "magic words" of "accommodation" or "disability," *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007) (citation omitted), "[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's

need or desire for an accommodation" *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998).

Here, there is nothing in the record to suggest that Underwood made a request for an accommodation. Underwood first alleges that he "request[ed] that he be allowed to periodically step off of his fork lift to stretch his back." (R. 30, PageID.687.) But he fails to cite to any evidence in the record that a specific *request* was actually made. Underwood's best evidence that he did make a request can be found in his deposition when he states that he "was having to stand up and stretch … and that wasn't even helping [the back spasms]," and that he "informed [Johnson] of that." (R. 27-1, PageID.185.) However, this language is not strong enough to allow the Court to reasonably construe a specific, verbal request for a stretching accommodation. *See Leeds*, 249 F. App'x at 449-50 (holding that informing his supervisors that the work was "kicking his ass" was not enough to find that the plaintiff had made a specific request for accommodation).

Underwood also argues that his second FMLA request should be construed as a request for "some type of reasonable accommodation" or that FMLA leave should have been granted as an accommodation. (R. 30, PageID.697; R. 41, PageID.750.) First, while leave can be granted as a form of reasonable accommodation, *Lafata v. Church of Christ Home for the Aged*, 325 F. App'x 416, 423 n.3 (6th Cir. 2009), this does not obviate the need for Underwood to first make a request. Second, Underwood's second FMLA request did not state that he needed any accommodations. (R. 27-1, PageID.337–340.) And Underwood cites no law stating that an FMLA request, where the doctor does not articulate a need for leave, can nevertheless be construed as a request for an accommodation under the ADA. Underwood's reasonable-accommodation claim fails as a matter of law.

**5.**

The Court last addresses Underwood's ADA retaliation claim. Yates raises two arguments for why this claim fails. First, Yates asserts that the claim is unexhausted. (R. 27, PageID.87–88.) Second, Yates argues, in the alternative, that Underwood cannot establish a prima facie case of retaliation. (R. 27, PageID.88–89.)

Yates says Underwood "failed to exhaust his ADA retaliation claim with the EEOC" by failing to indicate a "retaliation" claim on his charge. (R. 27, PageID.87.) Underwood disputes the significance of this fact as he was without counsel when he completed his EEOC charge. (R. 30, PageID.697.)

"As a general rule, a[n ADA] plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010). Permitting an action "to encompass claims outside the reach of the EEOC charges would deprive the charged party of notice and would frustrate the EEOC's investigatory and conciliatory role." *Id.* at 362. Nonetheless, "because aggrieved employees-and not attorneys-usually file charges with the EEOC, their pro se complaints are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge." *Id.*

Here, Underwood alleged, in part, that he has a disability and was taking medication for that disability, was harassed and told by his supervisor to stop taking his medications or be fired, that he complained about the comments to Human Resources, and was shortly after issued a final written warning. (*See* R. 27-1, PageID.342–43.) In the light most favorable to Underwood, it is reasonable to infer that a retaliation claim could grow out of these allegations.

Yates also argues that Underwood did not establish a prima facie case of ADA retaliation. Similar to FMLA retaliation, in order to demonstrate ADA retaliation, Underwood must show that:

(1) he engaged in ADA-protected activity, (2) Yates knew of this activity, (3) Yates took an adverse action against him, and (4) there was a causal connection. *Rorrer*, 743 F.3d at 1046 (citation omitted). Yates alleges failure of prongs two and four. (R. 27, PageID.88–89.)

As discussed previously, the Court will construe prong two in favor of Underwood.

While Yates does not contest prong one, Underwood has not clearly alleged his ADA-protected activity. Yates assumes in its motion that Underwood's complaints to Human Resources about Johnson's your-medicine-or-your-job comments are the protected activity. (R. 27, PageID.88.) But in his response, Underwood appears to allege that it is his "requests for accommodations that he made for his back injury" that is the activity protected by the ADA. (R. 30, PageID.698.) Either way, because both of these activities are related and both involve Johnson, the Court will proceed in its analysis.

Moving then to prong four, the Court finds that a reasonable jury could find the required causal connection between Underwood's ADA activity and the adverse action. Because Johnson was involved in some capacity in both the November 26th stretching incident and Underwood's firing, and since these two events were mere weeks apart, a causal connection is conceivable. (*See* R. 31, PageID.705–06, 711.) Underwood only had to "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity" that is "sufficient to allow 'an inference … that the adverse action would not have been taken had [Underwood] not engaged in protected activity.'" *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 699 (6th Cir. 2013) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563–66 (6th Cir. 2000)). And the Court believes this burden has been met.

Accordingly, the Court will assume for the purposes of this motion that Underwood can establish a prima facie case of ADA retaliation.

**B.**

With the Court assuming that Underwood has established prima facie cases for at least two of his four claims, the burden shifts to Yates to rebut the claims with a legitimate, non-discriminatory or non-retaliatory basis for the termination. *See Barlia*, 721 F. App'x at 445 (citations omitted). Yates has met its burden.

Yates has said that Underwood was terminated because he (1) was at the Final Written Reminder stage of its corrective action policy given his history of performance and safety issues, and (2) violated the company's tobacco policy by bringing a cup of used chewing tobacco inside the plant on December 12, 2014. (R. 27, PageID.81–83.) Underwood does not dispute that this was the reason provided by Yates. (R. 31, PageID.712.)

**C.**

But Underwood does argue that there is sufficient evidence for a jury to think Yates' reason is pretextual. (R. 30, PageID.689–93.)

Underwood can demonstrate that Yates' proffered legitimate, nondiscriminatory basis for his termination is pretext by showing that the reason "either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Ferrari v. Ford Motor Co.*, 825 F.3d 885, 895 (6th Cir. 2016) (ADA discrimination case); *see Donald*, 667 F.3d at 762 (applying this pretext framework to FMLA retaliation claims). For ADA retaliation, a plaintiff must demonstrate that the proffered reason is not the real reason and that the real reason was unlawful. *Williams v. AT&T Serv. LLC*, 847 F.3d 384, 396 (6th Cir. 2017). "Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) (discussing pretext in the Title VII context).

"[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id.*

Yates asserts that Underwood cannot show pretext because (1) he was at the Final Written Reminder stage, (2) violated the tobacco policy as written by carrying used tobacco into the plant, (3) there is no additional circumstantial evidence of discrimination, (4) Yates had no retaliatory or discriminatory motive, and (5) there is no evidence that similarly situated employees were not terminated for comparable behaviors or disabilities. (*See* R. 27, PageID.83–87.)

In response, Underwood offers five central pieces of evidence to demonstrate pretext. (R. 30, PageID.690–92.)

First, Underwood disputes whether he did, in fact, violate the written tobacco policy. (R. 30, PageID.692.) He contends that carrying a cup of used tobacco onto the plant floor does not violate the policy as written. (*Id.*) Underwood argues that Yates' stretching of the policy language is "direct evidence … to rebut Yates' proffered nondiscriminatory reason for taking the challenged action." (R. 30, PageID.692.) He also alleges that Yates failed to discipline "other possessors of tobacco products" under this policy. (*Id.*)

But it is no defense that Underwood did not in fact violate the policy so long as Tisdell's interpretation of the policy and belief of violation were honest. *See Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558–59 (6th Cir. 2009) (citation omitted) (discussing pretext in Title VII context). The "honest belief" rule provides that, "so long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 806 (6th Cir. 1998). In making this determination, the Court must consider "whether the employer made a reasonably informed and considered

decision before taking the complained-of action." *Id.* at 559 (citation omitted). Here, Underwood did not just have an unused pack of cigarettes or un-opened tin of dip in his pocket, which would not have violated the policy. (R. 27-4, PageID.538; R. 27-5, PageID.586.) Instead, he had an open container of used tobacco product on his forklift. While he was not actively using the chewing tobacco, it is reasonable to interpret the two tobacco policies as prohibiting the carrying of a cup of used tobacco product onto the plant floor. While Johnson acknowledged in his deposition that whether Underwood's action violated the tobacco policies would have been a tough call, he may have made the same determination at that time. (R. 27-4, PageID.538.) And while Underwood alleges that Yates did not discipline other "possessors of tobacco products," he does not point to anyone who had an open cup of used tobacco on equipment but was not disciplined.

Underwood next insists that Tisdell is lying. Underwood says it would have been impossible for Tisdell to have seen the tobacco as he approached Underwood's forklift because the cup was full of other trash. (R. 31, PageID.709.) However, even if the Court assumes that Tisdell could not have physically observed tobacco in Underwood's cup, Underwood admits that he promptly told Tisdell there *was* tobacco in the cup and that it was *his*. (R. 31, PageID.709.) So even if Tisdell approached the forklift not knowing there was tobacco in the cup, he quickly came to know about it because Underwood told him.

As Underwood puts forth no evidence that Tisdell's interpretation of the policy and subsequent action were unreasonable, or that Yates has not uniformly enforced the policy, his citation for violating the tobacco policy by placing a cup of used tobacco on his forklift is not a basis for establishing pretext. *See Sybrandt*, 560 F.3d at 558-59 (citation omitted) (holding that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging

an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect").

Third, Underwood argues that procedural irregularities in the actual termination would permit a reasonable jury to infer pretext. (R. 30, PageID.690–91.) Underwood asserts that having his Final Written Reminder period extended, rather than being terminated outright, is an irregularity in the Yates/Nissan firing process. (R. 30, PageID.690.) True, "procedural irregularities . . . do arouse suspicion of pretext." *Philbrick v. Holder*, 583 F. App'x 478, 486 (6th Cir. 2014) (discussing pretext in the Title VII context). But the deviation from the normal termination process that Underwood has identified worked in his favor. And Underwood has no authority (and the Court is aware of none) suggesting that a procedural irregularity that benefits the terminated party is evidence of discriminatory and/or retaliatory pretext. Thus, no reasonable jury would find this irregularity evidence of pretext.

Next, Underwood suggests that Yates' justification for giving him a Final Written Reminder extension, rather than termination, was under-documented and that the lack of documentation suggests pretext. (R. 30, PageID.691.) Underwood strengthens his claim by pointing out that all other decisions were "copiously documented" while the extension decision was not officially documented. (R. 30, PageID.691.) There is some limited case law to suggest that a lack of procedural documentation could be a sign of pretext. *See e.g., Cutcher v. Kmart Corp.*, 364 F. App'x 183, 191 (6th Cir. 2010) (discussing pretext in the FMLA retaliation context and noting that "the lack of documentation to corroborate her lower RIF appraisal scores" could be probative of pretext). But, as above, the Court fails to see how under-documenting a decision that results in a positive outcome for the employee would prove pretext on behalf of the employer.

Given that Yates documented all but one decision, and that this decision benefited Underwood, no reasonable jury would find lack of documentation sufficient to show pretext in this case.

That leaves timing. Underwood says the timing of his termination suggests that Yates was discriminating or retaliating against him. (R. 30, PageID.691–92.) But whatever the temporal proximity between his protected activity and his termination may be, temporal proximity is not alone sufficient to establish pretext. *See Williams*, 847 F.3d at 396 (citing *Donald*, 667 F.3d at 763 (discussing pretext in FMLA interference and retaliation context)) (discussing pretext in the ADA retaliation context and explaining, "Although temporal proximity can demonstrate a causal connection for the purposes of a prima facie case, it alone cannot establish pretext.")

Underwood also suggests that Yates was "lying in wait" for him to violate some policy so they could legally terminate him and thereby cover up its discrimination or retaliation. (R. 30, PageID.691 (citing *Hamilton v. GE*, 556 F.3d 428, 436 (6th Cir. 2009) ("We have held that when an employer ... waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee, the employer's actions constitute the very definition of pretext." (internal quotations omitted).) Given Underwood's admitted history of performance and safety violations (R. 31, PageID.702–05), no reasonable jury could find that Yates was waiting for an opportunity to terminate him, especially since Yates alleges to have had another opportunity a few weeks prior on November 26, 2014. (R. 28, PageID.664.)

Finally, Underwood suggests that being yelled at for leaving his forklift is proof of retaliatory animus. (R. 30, PageID.690.) It appears this argument refers to Underwood's claim that Johnson "talked to him in a very threatening way" on November 26, 2014. (R. 31, PageID.706.) Underwood's argument fails because this incident and the statements made by Johnson did not

ultimately lead to the decision to fire Underwood. In fact, Underwood was asked to return to work following this incident and suspension (R. 31, PageID.705–07), and a separate tobacco violation was the precipitating basis for Underwood's termination. (R. 31, PageID.708–09.) As "statements and actions by a decisionmaker 'outside of the decisionmaking process' cannot be the sole basis for proving pretext," *Hartman v. Dow Chem. Co.*, 657 F. App'x 448, 458 (6th Cir. 2016) (citation omitted) (discussing pretext in the FMLA retaliation context), Johnson's statements alone are not sufficient proof of pretext.

* * *

For the reasons explained above, each of Underwood's attempts at showing pretext fail. And the record is otherwise devoid of evidence that Yates "made up its stated reason" to cover up unlawful retaliation or discrimination. *Chen*, 580 F.3d at 400 n.4; *see Williams*, 847 F.3d at 396. Ultimately, even acknowledging the element of timing and Johnson's yelling incident, the Court finds that the evidence of pretext provided by Underwood is insufficient for a reasonable jury to find discrimination or retaliation. Even if the Court goes so far as to assume that Underwood has established a prima facie case for three of his four claims, he presents no more than a scintilla of evidence of pretext. *See Anderson*, 477 U.S. at 252. Thus, Yates is entitled to judgment as a matter of law. *Id.*

## IV.

For the reasons discussed, Yates' Motion for Summary Judgment is GRANTED on all counts.

SO ORDERED.

Dated: September 19, 2018                              s/Laurie J. Michelson
                                                       U. S. DISTRICT JUDGE